UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                                                    :
                                                                                 :
      QUIGLEY COMPANY, INC.                  :    Chapter 11
                                                                                 :    Case No. 04-15739(SMB)
                                 Debtor.       :
----------------------------------------------------------------X
QUIGLEY COMPANY, INC.,                                     :
                                                                                 :
                                                                                 :
              Plaintiff,                         :    Adv. Proc. No. 04-04262
                                                                                 :
          -- against --                            :
                                                                                 :
A.C. Coleman, THE OTHER PARTIES LISTED      :
ON EXHIBIT A TO THE COMPLAINT,              :
JOHN DOES 1-1000 AND JANE DOES 1-1000   :
                                                                                 :
             Defendants.                    :
----------------------------------------------------------------X

## MEMORANDUM OPINION AND ORDER
## CLARIFYING AMENDED INJUNCTION

**A P P E A R A N C E S:**

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Pfizer, Inc.
One World Financial Center
New York, New York 10281

      Bruce R. Zirinsky, Esq.
      John H. Bae, Esq.
           Of Counsel


BROWN RUDNICK BERLACK ISRAELS LLP
Attorneys for the Law Offices of Peter G. Angelos, P.C.
120 West 45th Street
New York, New York 10036

      Gregory T. Arnold, Esq.
           Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

On the same day that Quigley Company, Inc. ("Quigley") filed this asbestos bankruptcy case, the Court entered a preliminary injunction (<u>Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362(a) and Federal Rule of Bankruptcy Procedure 7065</u>, dated December 17, 2004 ("Preliminary Injunction") (ECF Doc. # 122)), which enjoined asbestos-related litigation against Quigley's non-debtor parent, Pfizer Inc. ("Pfizer"). By the <u>Amended Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362(a) and Federal Rule of Bankruptcy Procedure 7065</u>, dated December 6, 2007 ("Amended Injunction")(ECF Doc. # 238), the Court narrowed the relief granted to Pfizer. The Amended Injunction provided Pfizer with the same protection it would receive under 11 U.S.C. 524(g) if Quigley confirms its proposed plan.

The Law Offices of Peter G. Angelos, P.C. (the "Angelos Firm") represent asbestos claimants that had sued Pfizer prior to the Quigley petition date. The Angelos Firm contends that certain of its claims asserted against Pfizer in Pennsylvania are based on the Restatement (Second) of Torts § 400 ("Section 400"). As discussed below, Section 400 imposes a manufacturer's liability on an entity that places its name on a product manufactured by another.

It is undisputed that the Preliminary Injunction barred the Section 400 claims. The Angelos Firm contends, however, that the Amended Injunction does not, and has taken steps to prosecute them. For the reasons that follow, the Court concludes that the Section 400 claims are also enjoined under the Amended Injunction.

**BACKGROUND**

A.    **The Bankruptcy Court Injunctions**

The facts leading up to the issuance of the Preliminary Injunction are described in Quigley Co v. Coleman (In re Quigley Co.), 361 B.R. 670 (Bankr. S.D.N.Y. 2007). I assume familiarity with that decision, and highlight the facts relevant to the instant motion. Pfizer is a well-known pharmaceutical company. In addition to its pharmaceutical business, Pfizer manufactured or sold products that contained asbestos, including Kilnoise and Firex.

In 1968, Pfizer acquired Quigley. Quigley was engaged in the refractories business, and manufactured and sold products that contained asbestos, including Insulag. By the time Quigley filed this chapter 11 case on September 3, 2004, it was defending against over 160,000 asbestos-related lawsuits and claims. Pfizer had also been sued in many of the same actions. As of Quigley's petition date, approximately 109,200 claimants had asserted claims naming both Quigley and Pfizer, but it is impossible to tell whether the claims asserted against Pfizer are based on its own products or Quigley's. In re Quigley Co., 377 B.R. 110, 113 (Bankr. S.D.N.Y. 2007).

On the petition date, Quigley commenced this adversary proceeding to obtain an injunction stopping the lawsuits against the non-debtor Pfizer. Pfizer and Quigley shared liability insurance coverage, and the goal was to stop the litigation while Quigley made its anticipated quick trip through bankruptcy and confirmed a plan. The Preliminary Injunction issued by Bankruptcy Judge Beatty "enjoined [all parties] from taking any action in any and all pending or future Asbestos Related Claims against Pfizer during the pendency of Quigley's chapter 11 case."

3

The case proceeded more slowly than anticipated, but Quigley eventually proposed a plan that included an injunction in favor of Pfizer that, after some modification, tracked the language of 11 U.S.C. § 524(g). The proposed plan injunction was narrower than the Preliminary Injunction, and did not bar claims against Pfizer based on Pfizer products that had nothing to do with Quigley. Corresponding amendments were made to the Preliminary Injunction to parallel the more limited plan injunction. The resulting Amended Injunction restrained:

> any legal action against Pfizer alleging that Pfizer is directly or indirectly liable for the conduct of, claims against, or demands on Quigley to the extent such alleged liability of Pfizer arises by reason of —
>
>> (I) Pfizer's ownership of a financial interest in Quigley, a past or present affiliate of Quigley, or a predecessor in interest of Quigley;
>>
>> (II) Pfizer's involvement in the management of Quigley or a predecessor in interest of Quigley; or service as an officer, director or employee of Quigley or a related party;
>>
>> (III) Pfizer's provision of insurance to Quigley or a related party;
>>
>> (IV) Pfizer's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of Quigley or a related party, including but not limited to—
>>
>>> (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>>>
>>> (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

**B.    The Pennsylvania Litigation**

Beginning in 1999, the Angelos Firm commenced one or more lawsuits in Pennsylvania on behalf of numerous plaintiffs against Pfizer and others. The complaints identified Pfizer as a manufacturer of various asbestos products, including "asbestos spray insulation." (E.g., Memorandum in Opposition to Pfizer, Inc.'s Reply Brief on the Issue of the Permissible Scope of the Amended Injunction, dated Apr. 9, 2008 (the "Angelos Reply"), at Ex. A., ¶ 12(l) (ECF Doc. #259)). "Asbestos spray insulation" referred to Insulag. (Id. at p. 3.) In addition, after the

Amended Injunction was entered, the Angelos Firm sought to add Pfizer as a defendant in other cases based on the plaintiffs' exposure to Insulag. (Memorandum of Law of Pfizer Inc. in Support of Motion (I) To Enforce the Preliminary Injunction Order and (II) For Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, dated Feb. 28, 2008 ("Pfizer Memo"), at Ex. C (ECF Doc. # 242.)) Finally, the Angelos Firm filed or intends to file additional complaints in Pennsylvania naming Pfizer as a defendant based upon exposure to Insulag. (Id., at Ex. D, F.) In short, the Angelos Firm has sued Pfizer as a manufacturer of Insulag.

The Angelos Firm has now moved for partial summary judgment against Pfizer in many of these actions on the theory that Pfizer is liable as a manufacturer of Insulag under Section 400. (Id., at Ex. H, I, M and N.) The proof attached to these motions indicates that the Pfizer and Quigley names and logos, including, in some cases, the reference to Quigley as a subsidiary of Pfizer, appeared on diaries, advertisements and literature, purchase orders, invoices, packaging and sales reports relating to the manufacture or sale of Insulag.[1]

In response, Pfizer filed this motion to enforce the Amended Injunction. It maintains that it never manufactured Insulag — Quigley did — and the Pennsylvania actions seek to impose liability based upon its ownership or purported management of Quigley in violation of the Amended Injunction. Furthermore, Pfizer argues that it bargained for this relief under the plan, and is making a substantial contribution to get it. Allowing the Angelos Firm to prosecute these

---

[1] In addition, the 1999 Notes to Pfizer's Consolidated Financial Statements stated that "[t]hrough the early 1970s, Pfizer Inc. (Minerals Division) and Quigley Company, Inc. ("Quigley"), a wholly owned subsidiary, sold a minimal amount of one construction product and several refractory products containing some asbestos." The statement does not, however, refer to Insulag by name. (Memorandum Supporting Position That the Amended Injunction Does Not Extend to the Direct Pfizer Insulag Actions, dated March 17, 2008 ( "Angelos Memo" ), at Ex. 3 (ECF Doc. # 250)).

5

claims will undermine the foundation of the plan and the purpose of Pfizer's contribution, and prevent Quigley's successful reorganization.

Not surprisingly, the Angelos Firm disagrees. It contends that despite Pfizer's statements that it never manufactured or sold Insulag, Section 400 imposes a manufacturer's liability on Pfizer under Pennsylvania law. Furthermore, neither Bankruptcy Code § 524(g) nor the Amended Injunction can stop the prosecution of asbestos claims against Pfizer based upon allegations that it is directly responsible or liable for its own conduct. According to the Angelos Firm, "[t]he operative facts giving rise to Pfizer's liability may be related to, but they do not derive from, Quigley's actions." (Angelos Reply, at p. 2.)

## DISCUSSION

**A.    Section 524(g)**

The Amended Injunction provides the same protection as a channeling injunction under § 524(g).[2] The channeling injunction may

> enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(i) ….

11 U.S.C. § 524(g)(1)(B).

---

[2] The reasons why Pfizer is making the plan contribution, or the importance of the contribution to the success of the reorganization, have no bearing on the Court's power to enjoin the Section 400 claims. See Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 517 F.3d 52, 66 (2d Cir. 2008)("It was inappropriate for the bankruptcy court to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate."); In re Combustion Eng'g, Inc., 391 F.3d 190, 228 (3d Cir. 2004)("Although ABB Limited's contributions to the Asbestos PI Trust may depend on freeing Lummus and Basic of asbestos liability, and these contributions may inure to the benefit of certain Combustion Engineering asbestos claimants, these factors alone do not provide a sufficient basis for exercising subject matter jurisdiction. If that were true, a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions.").

The injunction is not limited to the debtor. The court may extend it to protect third parties to the extent that the third party is allegedly liable based upon a past connection with the debtor relating to its ownership, management, provision of insurance, or participation in a transaction that changes the debtor's structure or relates to its financial condition. 4 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 524.07[1], at 524-49 (15th rev. ed. 2007). Section 524(g)(4)(A)(ii), on which the Amended Injunction was based, states:

> Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of –
>
> > (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
> >
> > (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
> >
> > (III) the third party's provision of insurance to the debtor or a related party; or
> >
> > (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to -
> >
> > > (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
> > >
> > > (bb) acquiring or selling a financial interest in an entity as part of such a transaction

In short, § 524(g) permits a court to enter a channeling injunction that restrains certain types of claims against a non-debtor that would be payable from the assets of the non-debtor. Section 524 sets several requirements before a channeling injunction can protect non-debtor parties. Three of these requirements, posed in the form of questions, are at issue in the present proceeding: (1) does Pfizer's Section 400 liability arise directly or indirectly from the "conduct of, claims against, or demands on" Quigley; (2) will the Section 400 claims asserted by the

7

Pennsylvania plaintiffs against Pfizer be paid under Quigley's plan; and (3) does Pfizer's liability "arise by reason of" its ownership or management of Quigley? If the answer to each question is in the affirmative, the Section 400 claims are barred.

**B.    Section 400**

Section 400 creates "apparent" manufacturer liability. It provides:

> One who puts out as his own product a chattel <u>manufactured by another</u> is subject to the same liability as though he were its manufacturer.

RESTATEMENT (SECOND) OF TORTS § 400 (1965)(emphasis added). Section 400 is based on the rationale that "one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark [and]… there is an added emphasis that the user can rely upon the reputation of the person so identified." <u>Id.</u> at cmt. d. It was adopted as the law of Pennsylvania in <u>Forry v. Gulf Oil Corp.</u>, 237 A.2d 593, 599 (Pa. 1968). Pennsylvania treats the liability as vicarious, <u>Waters v. NMC-Wollard, Inc.</u>, No. 06-0032, 2007 WL 2668008, at *7 (E.D. Pa. Sept. 5, 2007); <u>Forry</u>, 237 A.2d at 599; <u>Haverstock v. T.I. Raleigh (USA)</u>, 557 A.2d 1068, 1070 (Pa. Super. Ct. 1989); accord <u>Morris v. American Motors Corp.</u>, 459 A.2d 968, 973 (Vt. 1982), and a claim based on Section 400 is inconsistent with the theory that the defendant actually manufactured the product. See <u>Haverstock</u>, 557 A.2d at 1070. The Pennsylvania plaintiffs' Section 400 claim must, therefore, be viewed as contending that Quigley actually manufactured the Insulag that caused their injuries, and that Pfizer "apparently" manufactured the Insulag.[3]

---

[3]    Consequently, it is unnecessary at this juncture to decide if Pfizer was an actual manufacturer of Insulag under some other theory, and I decline Pfizer's invitation to resolve that question.

8

I assume, solely for the purpose of analysis, that the Pennsylvania plaintiffs' evidence submitted in connection with their summary judgment motions establishes Section 400 liability against Pfizer. While the Angelos Firm views this as the end of the inquiry, it merely begins it. Section 524(g), and hence, the Amended Injunction, may nonetheless give the Court the power to enjoin the Section 400 claims. This requires consideration of the three questions already posed.

The first two answers are clearly in the affirmative. The Section 400 claims arise from Quigley's conduct. Quigley manufactured the Insulag that the Pennsylvania plaintiffs allege caused their injuries, and but for Quigley's allegedly tortious conduct, no Section 400 liability could exist.[4] Pfizer did not commit an actionable tort simply by placing its name and logo, or allowing Quigley to place the Pfizer name and logo, on Quigley corporate documents, forms and packaging. In addition, because Quigley, as the actual manufacturer, is liable for the same injuries, the Pennsylvania plaintiffs can assert their claims against the Quigley trust established under the proposed plan.

The more difficult question is whether Pfizer's liability "arises by reason of" its ownership or management of Quigley. At first glance, Pfizer's Section 400 liability "arises by reason of" the use of its name and logo by Quigley. According to the partial summary judgment motions submitted to the Pennsylvania courts, the Pennsylvania plaintiffs base their Section 400 claim on the appearance of the Pfizer corporate logo and name on certain documents that also included the Quigley logo and name, and related or referred to the manufacture or sale of

---

[4] For this reason, the Angelos Firm's contention that the Section 400 claims "do not depend upon Quigley's conduct," (Angelos Memo, at p. 9), is wrong.

9

Insulag. In addition, there was deposition testimony that the Pfizer logo appeared on Insulag packaging.

It is equally true, however, that Pfizer's Section 400 liability "arises by reason of" its corporate connection to Quigley. Quigley began manufacturing Insulag in the 1930s, thirty years before Pfizer acquired it. (Declaration of Louis Kilian, dated Feb. 28, 2008 (the "Kilian Declaration") at ¶ 13.)[5] Before and after Pfizer's acquisition, Quigley used identical promotional materials, except that Quigley added the Pfizer logo after the acquisition. (Id., at ¶ 16.) But for Pfizer's ownership and/or management of Quigley, its name and logo would never have been used, and the Angelos Firm conceded as much at oral argument. (Transcript of hearing, held Mar. 4, 2008 ("3/4 Tr.") at pp. 16-17 (ECF Doc. # 256.)) Although the actual and apparent manufacturers need not be corporate affiliates, when they are, it may be that the apparent manufacturer placed its logo (or allowed its logo to be placed) on the product because of the corporate relationship, i.e., as a statement of corporate affiliation.[6] If the corporate affiliation is the sine qua non of liability, the liability may be said to "arise by reason of " the corporate relationship.

The phrase "arises by reason of" is, therefore, ambiguous, and the meager legislative history does not provide any answers. The Angelos Firm's submissions ignore the phrase (except when quoting the statute), and instead, contend that third party protection is limited to derivative claims that arise from the debtor's conduct and the third party's connection to or

---

[5] The Kilian Declaration is annexed as Exhibit A to the Pfizer Memo.

[6] According to Mr. Kilian, Quigley unilaterally began using Pfizer's logo, and "Pfizer was not involved in that decision to place the Pfizer logo on the Quigley materials." (Kilian Declaration, at ¶16.) If correct, I assume that Pfizer acquiesced in its use. If Quigley used the Pfizer logo without Pfizer's consent, the Section 400 claim would fail on that ground. Pfizer has not made this argument.

10

affiliation with the debtor.  (Angelos Memo, at p.10.)   Conversely, where the third party's liability is based on its own conduct, § 524(g) does not apply.  (Id.)

The problem with this argument is that it creates a distinction that does not exist in the law.  The Angelos Firm cites several examples of "corporate relationship" derivative claims that can be enjoined under § 524(g) — successor-in-interest, alter ego, piercing the corporate veil, domination and control[7] and respondeat superior.  (Id.)  Except for respondeat superior, each of the "relationship" claims often involves conduct by the defendant, usually wrongful, before liability will attach.  For example, Pennsylvania imposes successor liability, inter alia, where the purchaser of assets continues the predecessor's business, the transaction was fraudulent and designed to escape liability, or the transfer was made without adequate consideration.  Continental Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1291 (Pa. 2005); Hill v. Trailmobile, Inc., 603 A.2d 602, 605 (Pa. Super. Ct. 1992).  Moreover, although alter ego liability is deemed to be derivative, see Bridgestone/Firestone, Inc. v. Carr's Tire Serv., Inc., Civ. A. No. 90-7106, 1992 WL 96303, at * 4 (E.D. Pa. Apr. 24, 1992); Trans Pacific Ins. Co. v. Trans-Pacific Ins. Co., 136 F.R.D. 385, 389 (E.D. Pa. 1991), it will only be imposed where there is "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud."  Lumax Industries, Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995)(internal quotation marks omitted); accord College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200, 207 (Pa. 1976)("It has been held that the corporate veil is properly pierced whenever one in control of a corporation uses that control

---

[7]  The doctrines of "piercing the corporate veil" and "alter ego" liability are same.  See Keene Corp. v. Coleman (In re Keene Corp.), 164 B.R. 844, 851 (Bankr. S.D.N.Y. 1994).  "Domination and control" is one basis to pierce the corporate veil.  Powers v. Lycoming Engines, Civ. A. No. 06-2993, 2007 WL 2702705, at *5 (E.D. Pa. Sept. 12, 2007); Botwinick v. Credit Exch., Inc., 213 A.2d 349, 354 (Pa. 1965).

11

or corporate assets to further one's own personal interests.")(citing Walkovszky v. Carlton, 223 N.E.2d 6 (N.Y. 1966)).

The use of the Pfizer name and logo pales in comparison to the wrongful conduct often required to impose derivative liability under these doctrines.  Yet the Angelos Firm's interpretation of § 524(g) would exclude Pfizer's Section 400 liability from the ambit of its protection, but include successor liability and veil piercing claims based on fraud.  This makes no sense.  Moreover, Section 400 liability has more in common with respondeat superior than with any other theory of liability.  As already noted, Pennsylvania considers Section 400 liability as vicarious, and vicarious liability is a form of derivative liability under Pennsylvania law.  See Mamalis v. Atlas Van Lines, Inc., 560 A.2d 1380, 1383 (Pa. 1989)(release of agent terminates "derivative claim" against the principal because "[a] claim of vicarious liability is inseparable from the claim against the agent."); accord McDermott v. Biddle, 647 A.2d 514, 528 (Pa. Super. Ct. 1994), rev'd on other grounds, 674 A.2d 665 (Pa. 1996).

The evidence presented on this motion shows that Quigley simply added the Pfizer logo to its existing documents and written materials after the Pfizer acquisition, but nothing else changed.  Furthermore, the Angelos Firm acknowledged that the Pfizer name and logo would not have been used by Quigley but for the Pfizer affiliation.  Under the facts presented, the joinder of the Quigley and Pfizer names and logos is a statement of corporate affiliation.  Even if it is sufficient to trigger Section 400 liability under non-bankruptcy law, that liability nevertheless "arises by reason of" Pfizer's ownership or management of Quigley.  Consequently, the Section 400 claim may be channeled into the Quigley trust.

The Second Circuit's recent decision in <u>Johns-Manville</u>, 517 F.3d 52, does not call for a different result. There, Manville confirmed its plan in 1986, prior to the enactment of § 524(g). Manville had reached a settlement with certain insurers, and the plan contained broad provisions that enjoined claims that "were based upon, arose out of, or related to Manville's liability insurance policies." <u>Id.</u> at 57.

Following confirmation, various groups of plaintiffs filed statutory and common law claims against the settling insurers. These claims alleged, in substance, that the settling insurers had learned about the dangers of asbestos from Manville, but had failed to disclose the asbestos related information to the plaintiffs. <u>Id.</u> at 57-58. The matter was brought before the bankruptcy court, and through mediation, some of the parties reached a settlement. As part of the settlement, the bankruptcy court issued a Clarifying Order stating that the 1986 channeling injunction had barred the statutory and common law claims based on the suppression of information. <u>Id.</u> at 59. After the district court affirmed the settlement, the objecting parties appealed.

The question before the Second Circuit was whether the bankruptcy court had subject matter jurisdiction to enjoin the statutory and common law claims against the settling insurers. Reversing the lower courts, the Second Circuit ruled that it did not. The claims did not seek to collect on the basis of Manville's conduct. <u>Id.</u> at 63. In addition,

> Plaintiffs seek to recover directly from a debtor's insurer for the insurer's own independent wrongdoing. Plaintiffs aim to pursue the assets of Travelers. They raise no claim against Manville's insurance coverage. They make no claim against an asset of the bankruptcy estate, nor do their actions affect the estate. The bankruptcy court had no jurisdiction to enjoin the Direct Action claims against Travelers.

<u>Id.</u> at 65 (internal reference omitted).

13

Although the Manville injunction pre-dated the enactment of § 524(g), the Court also analyzed the issue under that provision.[8] Citing the Third Circuit's decision in <u>Combustion Engineering</u>, the Court concluded that a § 524(g) injunction was limited to derivative liability for claims against a debtor, and "was not intended to reach non-derivative claims" that had no effect on the <u>res</u>.  <u>Id.</u> at 68.  According to the Court, the claims against Manville's insurers "are not derivative of Manville's liability, but rather seek to recover from Travelers for its own alleged misconduct."  <u>Id.</u>

Unlike the claims against the settling insurers in <u>Manville</u> (or the asbestos claims against Combustion Engineering's affiliates)[9], the Pennsylvania plaintiff's claims against Pfizer under Section 400 are vicarious and derivative under state law.  Thus, they satisfy the principal criterion identified by the <u>Manville</u> Court.  In addition, while Pfizer rather than Quigley would pay the liability, the same is generally true of all derivative liability.  The master must answer for the torts of his servant, the successor must satisfy the claims of its predecessor, and the parent corporation must pay the debts of its alter ego subsidiary.  Moreover, Pfizer may be entitled to indemnity from Quigley for any liability as an apparent manufacturer.  See <u>Burch v. Sears, Roebuck & Co.</u>, 467 A.2d 615, 624 (Pa. Super. Ct. 1983) (non-manufacturing retailer of defective product sold under its name was secondarily liable, and was entitled to indemnity from the actual manufacturer, who was primarily liable).  Consequently, a Section 400 claim may ultimately have a direct impact on Quigley.

---

[8]  The Court noted that § 524(g) was enacted in response to the <u>Manville</u> proceedings and "must be interpreted in the same manner."  <u>Johns-Manville</u>, 517 F.3d at 67.

[9]  The <u>Combustion Engineering</u> Court emphasized that the claims asserted against the debtor's subsidiaries were not "derivative" because they " [arose] from different products, involved different asbestos-containing materials, and were sold to different markets."  391 F.3d at 231.  In contrast, Pfizer's and Quigley's alleged liability arises from the manufacture and sale of the same product to the same person.

14

Accordingly, the Section 400 claims asserted against Pfizer by the Pennsylvania plaintiffs are covered by the Amended Injunction, and the Angelos Firm and its clients are directed to cease prosecuting them. This opinion does not address any other claims that may be asserted against Pfizer under a different theory.

So Ordered.

Dated: New York, New York
May 15, 2008

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge